UNITED STATES of America,

v.

Scott David HARLOFF, Gregory Robin Raggi, Michael David Mazzeo, Thomas William Alessi, James William O'Brien, and Gordon Frederick Urlacher, Defendants.

No. 91–CR–205T.

United States District Court,
W.D. New York.

June 12, 1992.

Michael J. Gennaco, U.S. Dept. of Justice, Civil Rights Div., Washington, DC, for U.S.

Ronald S. Carlisi, John R. Parrinello, Karl F. Salzer, John F. Speranza, Anthony F. Leonardo, David Rothenberg, Rochester, NY, for defendants.

## ORDER*

TELESCA, Chief Judge.

A 19–count Indictment, filed August 29, 1991, charges the defendants, individually or collectively, with violations of 18 U.S.C. § 241 (conspiracy to violate civil rights), 18 U.S.C. § 242 (deprivation of civil rights under color of law), 18 U.S.C. § 371 (conspiracy to commit an offense or offenses against the United States), 18 U.S.C. § 666 (theft or embezzlement from certain federally funded programs), and 18 U.S.C. § 924(c) (use of a firearm in commission of a violent crime). This action was referred September 3, 1991 to United States Magistrate Judge Kenneth R. Fisher pursuant to 28 U.S.C. § 636(b)(1)(A)–(B). Defendants' various omnibus motions are the subject of a Decision and Order and Report and Recommendation filed April 10, 1992 and a separate Report and Recommendation filed April 23, 1992.

As to Magistrate Judge Fisher's Report and Recommendation filed April 10, 1992, defendants Harloff, Raggi, Mazzeo, and Alessi object to Magistrate Judge Fisher's recommendation that the Court deny, without a hearing, defendants' motion to dismiss the indictment which is based on DR 7–104(A)(1), defendants' Fifth and Sixth Amendment rights, and *U.S. v. Hammad,* 858 F.2d 834 (2d Cir.1988).

As to Magistrate Judge Fisher's Report and Recommendation filed April 23, 1992, all defendants object to Magistrate Judge Fisher's recommendation that the Court deny, without a hearing, defendants' motion to dismiss the indictment for improper use of immunized testimony (a *"Kastigar"* motion).

I have carefully reviewed Magistrate Judge Fisher's Decision and Order and Reports and Recommendations, as well as the defendants' objections thereto, and the Government's responsive submissions. Initially, I note that defendants' objections consistently fail to comply with the specificity required of such objections by 28 U.S.C. § 636(C) and Local Rule 30(a). Notwithstanding those deficiencies, I have considered defendants' objections, and find them to be without merit.

Insofar as defendants object to Magistrate Judge Fisher's Report and Recommendation, dated April 24, 1992, to deny a pre-trial Kastigar hearing, I would only reemphasize Magistrate Judge Fisher's determination that the Government has met its burden of showing an independent source for any potentially relevant evidence "tainted" by an alleged misuse of defendants' immunized testimony before the Professional Standards Section of the Rochester Police Department. *See U.S. v. Rivieccio,* 919 F.2d 812, 817 (2d Cir.1990). The defendants' allegations simply do not warrant such a hearing prior to trial; neither justice nor Fed.R.Crim.P. 16 requires it.

Wherefore, as to Magistrate Judge Fisher's Report and Recommendation filed April 10, 1992: his recommendation that the motion of defendants Harloff, Raggi, Mazzeo, and Alessi to dismiss the Indictment based on DR 7–104(A)(1), defendants' Fifth and Sixth Amendment rights, and *U.S. v. Hammad,* is adopted, and such motion is accordingly denied. Magistrate Judge Fisher's Report and Recommendation, filed April 23, 1992, that defendants' motion to dismiss the Indictment for improper use of immunized testimony pursuant to *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) be denied is adopted, and the motion is accordingly denied with leave to renew, if appropriate, at the completion of the trial.

* Editor's Note: Portions of the order have been omitted by the court.

ALL OF THE ABOVE IS SO OR-
DERED.

## DECISION AND ORDER

## REPORT AND RECOMMENDATION

## ON MOTIONS TO SUPPRESS

## AND FOR DISMISSAL **

FISHER, United States Magistrate Judge.

Following defendants' indictment for several civil rights and other violations allegedly committed by them in their capacity as police officers investigating narcotics crimes in the City of Rochester, defendants filed omnibus motions. The government responded, and the matter came on for oral argument after which several post-argument submissions were made. The following is my Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) that their motions for suppression of evidence be denied without a hearing. Defendants' motion for dismissal of the indictment on the ground of improper use of immunized testimony given to the Professional Standards Section of the Rochester Police Department is treated in a separate Report and Recommendation to be filed later. These motions were referred to me by Chief Judge Michael A. Telesca pursuant to 28 U.S.C. § 636.

\* \* \*

## VIII. THE MORRIS TAPES AND THE HAMMAD ISSUE

Defendants Harloff, Raggi, Mazzeo, and Alessi move to dismiss the indictment, or in the alternative for suppression of evidence, on the ground that the government enlisted the services of defendants' fellow investigator, William Morris, as a government informant. Morris surreptitiously taped conversations with each of these defendants at a time prior to the indictment but after defendants' attorneys each contacted the government for the purpose of thwarting investigative contact with their clients. Defendants contend that the government's employment of Morris for this purpose violated N.Y.Code of Professional Responsibility DR 7–104(A)(1) which is made applicable in this district by Local Rule 5(c). *United States v. Hammad,* 858 F.2d 834, 837–38 (2d Cir.1988), *cert. denied,* 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990); *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1386 (2d Cir.1976) ("The Code has been adopted by the New York State Bar Association, and its Canons are recognized by both federal and state courts as appropriate guidelines for the professional conduct of New York lawyers."); *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 227 n. 2 (2d Cir.1977) (same); *NCK Organization Ltd. v. Bregman,* 542 F.2d 128, 129 n. 2 (2d Cir.1976) (same); *Paretti v. Cavalier Label Co., Inc.,* 722 F.Supp. 985, 986 (S.D.N.Y.1989) (same). Defendants also contend that this conduct was sufficiently "blatant," "outrageous," "egregious," and "dastardly" to violate the Fifth Amendment Due Process Clause, and that the effect of Morris' conduct was to impermissibly invade the attorney-client relationship in violation of the Sixth Amendment.

The predicate for defendants' motions are letters of each counsel. The first communication is a letter, dated December 17, 1990, from Harloff's counsel, John R. Parrinello, Esq., directed to the Chief of the Rochester Division of the United States Attorney's office, Bradley E. Tyler, Esq., which demanded "that no member of your office or any law enforcement agency working for or in conjunction with your office have any contact whatsoever with Mr. Harloff including but not limited to personal interviews, consensual taping and the like." Similarly, on December 27, 1990, Raggi's counsel, David Rothenberg, Esq., sent a letter to Tyler demanding "that no contact be made directly with him, but that the government contact our offices. More specifically, no agents of the government should contact, question or interview officer Raggi without permission." Mazzeo's counsel sent a letter to the Criminal Section of the Civil Rights Division, Department of Justice (Michael J. Gennaco, Esq., of coun-

---

** This Report and Recommendation has been edited for publication.

sel) which demanded "that any and all communications to officer Mazzeo be directed to me. Any attempts to interview or talk with him should be done through me." This letter was dated May 30, 1991. Finally, Alessi's counsel, John F. Speranza, Esq., wrote Gennaco on June 17, 1991, confirming that he represented Alessi.

The Morris conversations, recorded on tapes and transcribed, began on May 8, 1991, and continued through July 17, 1991. The indictment was filed September 3, 1991. No other proceedings concerning the defendants, formal or informal, other than the grand jury investigation itself, were previously commenced.

In affidavits filed by Gennaco, Cathleen M. Mahoney, Esq. (also an attorney in the Criminal Section of the Civil Rights Division), Michael Berkow (an investigator with the Rochester Police Department), and FBI Special Agent William Dillon, the government explains the purpose of enlisting Morris in the investigation. Each denies the existence of any improper or illicit investigative purpose. It appears from these affidavits that Morris contacted Berkow at the Rochester Police Department in January of 1991 to express his interest in cooperating with the civil rights investigation then known to be ongoing. According to Gennaco and Berkow, Morris said "that he was afraid to cooperate because he was aware of leaks from the grand jury and thought that the other targets of the investigation would learn of his cooperation." Gennaco affidavit at ¶ 3; Berkow affidavit at ¶ 3 (both attached as Exhibit E in the government's appendix). On the other hand, Morris told Berkow that he would "wear a listening device to meetings with the other targets."

A meeting was convened between Gennaco, Mahoney, Berkow, FBI Special Agent Eugene Harding, Morris, and Lawrence J. Andolina, Esq., Morris' attorney, during which the subject of cooperation and an investigative strategy was discussed. According to Gennaco and Berkow, Morris informed the meeting participants that the defendants often met without their attorneys to discuss the case. Morris also told them that some of the defendants "discussed the possibility of taking violent action against suspected prosecution witnesses, investigators and/or high officials of the Rochester Police Department." Gennaco affidavit at ¶ 5; Berkow affidavit at ¶ 5. A cooperation agreement was signed on May 3, 1991, and Morris thereafter began meeting with the defendants, equipped with a listening device. Gennaco and Berkow "instructed Mr. Morris to act as a listening post to gain information about any ongoing or future criminal activity and to attend the meetings as he had before." Gennaco affidavit at ¶ 8; Berkow affidavit at ¶ 8. Gennaco and Berkow claim in their affidavits that they "told Mr. Morris not to attempt to steer the conversation to any particular subject.... [and they] did not provide Mr. Morris with a script or any questions to ask." Gennaco affidavit at ¶ 8; Berkow affidavit at ¶ 8. Special Agent William Dillon confirmed these accounts in his affidavit.

The government contends that, to warrant a hearing, "defendants must necessarily challenge the previously submitted affidavits of Michael Gennaco, William Dillon, and Michael Berkow which establish that the United States resorted to the use of a listening device on William Morris for legitimate law enforcement purposes and did not instruct Mr. Morris to ask questions or attempt in any way to learn information about defendants' legal strategy or conversations." Letter of Michael J. Gennaco, Esq., dated January 17, 1992, at 3. Relying on *United States v. Boylan*, 620 F.2d 359, 362 (2d Cir.1980), *cert. denied*, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980), the government further contends that defendants' reference to the taped transcripts themselves, which are the primary basis of defendants' motion, "provide no evidence whatsoever that the [government-]submitted affidavits are false." Gennaco letter at 4.

Defendants rely principally upon *United States v. Hammad, supra*, which held that statements taken by government agents in the pre-charge or investigative stage in violation of DR 7–104(A)(1) must be suppressed. They insist also that Morris' con-

duct on behalf of the government contravened the Fifth and Sixth Amendments. Accordingly, each source of the "right" asserted by defendants as a ground for dismissal and suppression must be examined.

### A. *Defendants' Sixth Amendment Claim*

 Because the defendants were not yet charged with the crimes which are the subject of Morris' conversations with them, and no "judicial proceedings [we]re initiated against ... [them], 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment,'" *United States v. Kon Yu–Leung,* 910 F.2d 33, 37 (2d Cir.1990) (quoting *Carvey v. Le-Fevre,* 611 F.2d 19, 21 (2d Cir.1979) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972)), defendants' Sixth Amendment right to counsel had not "attached" until well after the conversations at issue. *See McNeil v. Wisconsin,* —— U.S. ——, ——, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991); *Michigan v. Jackson,* 475 U.S. 625, 629 & n. 3, 106 S.Ct. 1404, 1407 & n. 3, 89 L.Ed.2d 631 (1986); *Alexander v. State of Connecticut,* 917 F.2d 747, 751 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2831, 115 L.Ed.2d 1000 (1991); *United States v. Rodriguez,* 888 F.2d 519, 525–26 (7th Cir.1989),

*suppression stipulated upon remand,* 732 F.Supp. 905 (N.D.Ill.1990); *United States v. Muzychka,* 725 F.2d 1061, 1064–65 (3rd Cir.1984), *cert. denied,* 467 U.S. 1206, 104 S.Ct. 2390, 81 L.Ed.2d 348 (1984).[1] "[T]he fact that a person is the subject of an investigation is not enough to trigger his Sixth Amendment right to counsel," *United States v. Vasquez,* 675 F.2d 16, 17 (2d Cir.1982), even if that person retains counsel. *Moran v. Burbine,* 475 U.S. 412, 431, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986) (*Moulton* "all but forecloses respondent's argument that the attorney-client relationship itself triggers the Sixth Amendment right"). A tape recording of a conversation between a government informant and an ultimately indicted defendant made during the investigative stage does not involve a "tape recording ... made in violation of his Sixth Amendment right to counsel." *United States v. Vasquez,* 675 F.2d at 16–17. The situation would be "different," of course, if the indictment had been filed prior to the conversations at issue or if defendants had requested counsel at an initial appearance held prior to the challenged conversations. *United States v. Ryans,* 903 F.2d 731, 740–41 (10th Cir. 1990), *cert. denied,* 498 U.S. 855, 111 S.Ct. 152, 112 L.Ed.2d 118 (1990).[2] *See Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Indeed, even

---

**1.** Because no charges of any kind had yet been filed, it is unnecessary to reach the question of whether the offenses which were the subject of the government's investigation and Morris' taped conversations with the defendants (threat of reprisals against witnesses) were sufficiently distinct from the charges, which eventually became the subject of the grand jury indictment, to render the attachment of the right to counsel on the latter inapplicable to the Sixth Amendment right to counsel with respect to the former. *Compare, McNeil v. Wisconsin,* —— U.S. at —— – ——, 111 S.Ct. at 2207–08 (Sixth Amendment right to counsel is "offense specific"); *Illinois v. Perkins,* 496 U.S. 292, 299, 110 S.Ct. 2394, 2399, 110 L.Ed.2d 243 (1990); *Patterson v. Illinois,* 487 U.S. 285, 290 n. 3, 108 S.Ct. 2389, 2393 n. 3, 101 L.Ed.2d 261 (1988); *Maine v. Moulton,* 474 U.S. 159, 176, 180 n. 16, 106 S.Ct. 477, 487, 489 n. 16, 88 L.Ed.2d 481 (1985); *Moran v. Burbine,* 475 U.S. 412, 431, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986); *Alexander v. State of Connecticut,* 917 F.2d at 751 & n. 1; *United States v. Rodriguez,* 888 F.2d at 526 n. 5, *with*

*United States v. Mitcheltree,* 940 F.2d 1329, 1339–42 (10th Cir.1991) (finding that attachment of the right to counsel with respect to indicted crimes does not prevent legitimate investigation of witness tampering unless in connection with that investigation the government also deliberately elicits statements from the defendant which pertain to the indicted crimes); *United States v. Terzado–Madruga,* 897 F.2d 1099, 1110 (11th Cir.1990) (legitimate investigation of collateral crimes for which the right to counsel has not attached may not occur in a government created setting likely to produce incriminating statements relating to the crime on which the right to counsel had attached). Defendants' Sixth Amendment rights did not "attach" until the filing of the indictment.

**2.** *Montoya v. Collins,* 955 F.2d 279, 283 (5th Cir.1992) (a defendant must do more than simply be indifferent to the appointment of counsel at an initial appearance to have the right to counsel "attach"); *United States v. Charria,* 919 F.2d 842, 848 n. 3 (2d Cir.1990).

if the right to counsel had attached because of a request for counsel in the context of a pending judicial proceeding or by virtue of the filing of the indictment,

> [t]he Sixth Amendment has not been interpreted to provide a cloak of immunity for a defendant during the pendency of an indictment, *see Hoffa v. United States*, 385 U.S. 293, 307–08, 87 S.Ct. 408, 416, 17 L.Ed.2d 374 (1966), *reh'g denied*, 386 U.S. 951, 87 S.Ct. 970, 17 L.Ed.2d 880 [ (1967) ] (1966), nor to provide a right to consult counsel for advice on committing crimes.... especially ... where the offense under investigation is a new or ongoing one, such as illegal efforts to thwart the forthcoming prosecution."

*United States v. Terzado–Madruga*, 897 F.2d 1099, 1112 (11th Cir.1990).

Nor do the defendants find support in the so-called invasion-of-the-"defense camp" cases. *See e.g., Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); *United States v. Levy*, 577 F.2d 200 (3rd Cir.1978); *United States v. Gartner*, 518 F.2d 633 (2d Cir.1975) (collecting cases), *cert. denied*, 423 U.S. 915, 96 S.Ct. 222, 46 L.Ed.2d 144 (1975). These cases only involve "an indicted defendant," *United States v. Ryans*, 903 F.2d at 741 n. 11; *see also, United States v. Morales*, 635 F.2d 177, 179 (2d Cir.1980), or a defendant whose Sixth Amendment right to counsel had attached because he requested counsel in connection with a formal adversary process. *Moran v. Burbine*, 475 U.S. at 430, 106 S.Ct. at 1145–46 ("The Sixth Amendment's intended function is not to wrap a protective cloak around the attorney-client relationship for its own sake any more than it is to protect a suspect from the consequences of his own candor."); *United States v. Charria*, 919 F.2d 842, 848 n. 3 (2d Cir.1990) (where defendant had not retained or accepted appointment of counsel

at arraignment, "the 'distinct set of constitutional safeguards aimed at preserving the sanctity of the attorney-client relationship ... are inapplicable") (quoting *Patterson v. Illinois*, 487 U.S. at 290 n. 3, 296–97 n. 9, 108 S.Ct. at 2393 n. 3, 2397 n. 9); *United States ex rel. Shiflet v. Lane*, 815 F.2d 457, 465 (7th Cir.1987) (a defendant "cannot claim the protection of the sixth amendment merely because he retained counsel prior to the filing of charges against him."), *cert. denied*, 485 U.S. 965, 108 S.Ct. 1234, 99 L.Ed.2d 433 (1988); *United States v. Fortna*, 796 F.2d 724, 731 (5th Cir.1986), *cert. denied*, 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986).

Even if existing case law would permit a challenge to the indictment or to the evidence procured by a government informant who invaded the defense camp prior to the initiation of adversary judicial criminal proceedings, defendants would have to show "some communication of valuable information derived from the intrusion to the government: absent such communication, there exists no realistic possibility of either prejudice to the defense or benefit to the government." *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir.1985). In this case, defendants do not "establish that privileged information [was] passed to the government or that the government ... intentionally invaded the attorney-client relationship, *and [suffered] resulting prejudice.*" *United States v. Dien*, 609 F.2d 1038, 1043 (2d Cir.1979) (quoted in *United States v. Ginsberg*, 758 F.2d at 833) (bracketed material and emphasis supplied).[3] All of the examples of exchanges between Morris and the defendants which make reference to defense counsel are innocuous in themselves, regardless of Morris' intention in eliciting them. None of the exchanges reveal defense strategy, identification of witnesses or other evidence, and they are otherwise devoid of substantive content. *United States v. Lebron*, 222 F.2d 531,

---

**3.** For the reasons stated in *United States v. Ryans*, 903 F.2d at 741 n. 13, the Morris tapes are not protected by the attorney-client privilege. Defendants do not appear to contend otherwise. The defendants willingly spoke with Morris and with one another. Confidentiality of an individual defendant's communications

with his or her lawyer "must be jealously guarded by the holder of the privilege lest it be waived.... [because] [t]he courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *In re Sealed Case*, 877 F.2d 976, 980 (D.C.Cir.1989).

534–35 (2d Cir.1955). Moreover no attorney-client conferences were infiltrated. In short, the "defense camp," insofar as it implicates the attorney-client relationship with respect to any one of the defendants, was not invaded; defendants have "demonstrated no prejudice of any kind, either transitory or permanent, to the ability of ... counsel to provide adequate representation in these criminal proceedings." *United States v. Morrison*, 449 U.S. 361, 366, 101 S.Ct. 665, 669, 66 L.Ed.2d 564 (1981). *See also, United States v. Gartner*, 518 F.2d at 638.

In addition, there is no warrant for an evidentiary hearing. *United States v. Ginsberg*, 758 F.2d at 833–34. Although the defense camp cases are described to show that defendants do not establish entitlement to relief under them, they simply do not apply, as the Sixth Amendment does not apply here, because defendants' Sixth Amendment rights had not attached. No useful purpose would be served by a hearing.

### B. *The Hammad Issue*

■ In *United States v. Hammad*, 858 F.2d 834 (2d Cir.1988), *cert. denied*, 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990), the court applied N.Y.Code of Professional Responsibility DR 7–104(A)(1) to criminal investigations in a case involving government agents who unquestionably knew, as the government agents indeed knew in this case, that the defendant was represented by counsel. In *Hammad*, defense counsel simply telephoned the Assistant United States Attorney in charge of the investigation, as Mr. Speranza did here, for the purpose of informing him that he represented the defendant in connection with the investigation in question. Of course, the other counsel in this case went further, by instructing the government not to speak with the client. Rejecting the government's argument that the disciplinary rule was simply coextensive with the Sixth Amendment, the court held that a

prosecutor, through a government agent, may violate DR 7–104(A)(1) in limited circumstances not covered by the "authorized by law" savings clause of DR 7–104(A)(1). DR 7–104(A)(1) prohibits a government attorney from directing "communicat[ion] on the subject of the representation with a party ... [the government lawyer] knows to be represented by a lawyer in that matter unless ... [the government lawyer] has the prior consent of the lawyer representing such other party [i.e., the defendant] or is authorized by law to do so."

The savings clause is the key ingredient here. In *Hammad*, the Second Circuit observed that "a prosecutor is 'authorized by law' to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization." *United States v. Hammad*, 858 F.2d at 839. In its only decision since *Hammad*, the Second Circuit upheld the investigative technique in question, noting that the finding of an ethical violation in *Hammad* was "limited ... to the circumstances of that case." *United States v. Schwimmer*, 882 F.2d 22, 29 (2d Cir.1989).[4]

As this court stressed in *United States v. Buda*, 718 F.Supp. 1094 (W.D.N.Y.1989), the critical element in *Hammad* was the abuse of the grand jury subpoena process by a prosecutor who authorized the issuance of a "counterfeit grand jury subpoena" directed to the defendant and displayed to him by the informant, which ultimately induced him to make incriminating statements. *Id.*, 718 F.Supp. at 1095–96. Although defendants seek to liken one aspect of Morris' conduct (his attempt to trick Harloff into thinking that the police were tracking him and indeed were present near his home on the night of July 16, 1991— Rothenberg affidavit, sworn to January 23, 1992) to the counterfeit sham subpoena in *Hammad*, there are two reasons why this analogy is without merit. First, there is no evidence that any of the prosecutors direct-

---

**4.** The rationale of *Hammad* was rejected in *United States v. Ryans*, 903 F.2d at 734–41 (col-

lecting cases).

ed or otherwise encouraged and prompted Morris to undertake this deception with Harloff. In *Buda*, it was important that the prosecutor "in no way attempted to direct the content of ... [the informant's] conversation with the defendant so as to beguile him into giving his case away." *Id.*, 718 F.Supp. at 1096. Second, the deception is alleged to have occurred on July 16th, only one day before Morris' activities on behalf of the government ceased and he pled guilty. Even if Morris' deception might trigger the *Hammad* rule by taking the undercover investigation out of the "authorized by law" exception to DR 7-104(A)(1), it occurred too late to provide any basis for suppression of conversations held before that date. Third, the use of a deception by the informant concerning the claimed presence of police at the defendant's residence is of a completely different character than the employment of a counterfeit sham grand jury subpoena that is rightfully regarded as an egregious use of court process. As only recently reiterated in *Jacobson v. United States*, —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992):

> [T]here can be no dispute that the Government may use undercover agents to enforce the law. "It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States*, 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932); *Sherman v. United States*, 356 U.S. [369], 372, 78 S.Ct. [819], 820 [2 L.Ed.2d 848 (1958)]; *United States v. Russell*, 411 U.S. 423, 435-36, 93 S.Ct. 1637, 1644-45, 36 L.Ed.2d 366 (1973).

*Id.*, —— U.S. at ——, 112 S.Ct. at 1540. A "[l]ie about purported surveillance and investigations of the defendant" (Rothenberg affidavit at ¶ 22) is no more deceptive than the use of an undercover informant is itself. It stands on a completely different footing than the unauthorized and ultimately illegal use of court process which produces and employs a counterfeit sham grand jury subpoena to secure evidence outside the grand jury room. Defendants cite no case for the proposition that Morris' deception of Harloff is an invalid or illegal investigative technique not authorized by law within the meaning of DR 7-104(A)(1), and of course there is no such case.

Finally, *Hammad*'s functional extension of the right to counsel to the investigative stage through the device of the no-contact rule of DR 7-104(A)(1), *see* Pamela S. Karlan, *Discrete Relational Criminal Representation: The Changing Vision of the Right to Counsel*, 105 Harv.L.Rev. 670, 701-02 (1992) (extension of the no-contact rule to the investigative stage "would essentially circumvent the temporal limitation on the right to counsel contained in the Sixth Amendment"), provides no greater right to a defendant than would exist if the Sixth Amendment right to counsel had "attached." As described above, invocation of a defendant's Sixth Amendment rights with respect to a crime does not preclude government investigation, with the use of clandestine informants, of collateral criminal conduct such as witness tampering, at least if the investigation does not deliberately elicit incriminating statements concerning the discrete crime for which the constitutional right to counsel has attached. *United States v. Mitcheltree*, 940 F.2d at 1342 ("indeed, the government *should* investigate efforts to derail a pending prosecution such as a witness or jury tampering or other attempts to obstruct justice") (emphasis in original). Acceptance of defendants' arguments drawn from *Hammad* would require an extension of its no-contact rule to preclude investigative contact with defendants relative to any crime committed after the attorneys sent their letters to the government, thereby creating a sweeping protective cloak that even the Sixth Amendment does not provide in the post-charge stage of a pending criminal proceeding. Yet, this result is urged in a case which, because the Sixth Amendment right had not yet attached, does not involve any constitutional constraints on the subject of the government's investigation that prevents inquiry into the underlying civil

rights crimes as would exist if the defendants had been at that time indicted for those crimes. Such an interpretation of the no-contact rule would involve a breathtaking expansion of *Hammad* well beyond the facts of that case. *United States v. Schwimmer*, 882 F.2d at 29 (*Hammad* "limited the holding to the circumstances of that case").

For all of these reasons, defendants' motion to dismiss the indictment or in the alternative for suppression of evidence grounded in the *Hammad* rule is without merit, and it is my report and recommendation that such motion be denied.

### C. *The Fifth Amendment Due Process Claim*

Defendants only mention the Fifth Amendment Due Process clause as a source for the right asserted by them. Other than references to "outrageous[ness]" and the like, this argument is not developed to any appreciable degree in defendants' papers. Although there may be good reason to reject a due process outrageous governmental conduct claim on separation of powers grounds, *see United States v. Miceli*, 774 F.Supp. 760, 769 (W.D.N.Y.1991),[5] the Second Circuit recognizes a due process defense to prosecution, "if the government violates a protected right of the defendant" and "if the government's conduct 'reach[ed] a demonstrable level of outrageousness.' " *United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir.1991) (quoting *Hampton v. United States*, 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring)). *See* cases collected at *United States v. Miceli*, 774 F.Supp. at 769–70. What constitutes "a demonstrable level of outrageousness" cannot be identified with

any precision, but "the due process claim, in the rare instances when successful, has prevailed to restrain law enforcement activities that involve *coercion*, . . ., or outrageous violation of *physical integrity*," *United States v. Myers*, 692 F.2d 823, 837 (2d Cir.1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983) (emphasis supplied), or psychological integrity. *United States v. Cuervelo*, 949 F.2d at 565; *United States v. Chin*, 934 F.2d 393, 399 n. 4 (2d Cir.1991).

The government's conduct involving Morris' undercover activities cannot fairly be characterized in this fashion, notwithstanding defendants' attempts to do so. As determined above, Morris' conduct was entirely lawful and did not prejudice defendants' constitutional or other rights. On virtually identical facts, the Tenth Circuit has rejected a similar claim, finding that an immunized government informant's taped conversations with the defendant, which were aggravated by a "systemati[c] inva[sion]" of the defendant's attorney-client relationship well beyond the minimal, if virtually non-existent, invasion of the attorney-client relationship in this case, was "clearly not an example of government conduct that is 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.' " *United States v. Ryans*, 903 F.2d at 740 n. 10 (quoting *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973)).[6] At bottom, the governmental conduct here, i.e., employing defendants' fellow law enforcement investigator, who was thought by the defendants to be a target and an eventual co-defendant, involves no more of a psychological intrusion than the "feelings of 'betrayal' [that]

---

5. *See United States v. Miller*, 891 F.2d 1265, 1271–73 (7th Cir.1989) (Easterbrook, J., concurring) (observing that police investigative tactics pose a "political problem" only, and that "[w]e deem it enough to support punishment that this person committed this offense, leaving to other institutions the redirection of investigative or prosecutorial resources").

6. Although it is true that *Ryans* rejected the Second Circuit's interpretation of DR 7–104(A)(1) in *Hammad,* and this court is bound

to follow *Hammad* and not *Ryans* on that issue, the other holdings of *Ryans*, i.e., that employment of the immunized government witness to tape conversations of the defendant in the investigative stage did *not* rise to a demonstrable level of outrageousness to make out a due process claim, and that the attorney-client privilege was not breached, *id.* 903 F.2d at 741 n. 13, are persuasive and I apply the latter two holdings here. *See* text accompanying n. 3, *supra.*

[we]re not [found to be] the sort of injuries that constitute a violation of defendant's rights under the Due Process Clause" in *United States v. Chin*, 934 F.2d at 399 n. 4. *See also, Moran v. Burbine*, 475 U.S. at 432–33, 106 S.Ct. at 1146–47.

For this reason, and because defendants do not develop the due process outrageousness argument beyond simply alleging it, it is my report and recommendation that the motion for dismissal and/or suppression of evidence on the ground of the Fifth Amendment's Due Process Clause be denied.

## CONCLUSION

The foregoing is my Report and Recommendation that, with the exception of the *Kastigar* motion which will be the subject of a separate Report and Recommendation, defendants' motions for dismissal of the indictment and to suppress evidence be denied without a hearing.

The parties should be on notice that, pursuant to 28 U.S.C. § 636(b)(1)(C) and Local Rule 30(a)(3), any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt thereof. Failure to file objections within the specified time waives the right to appeal a District Court Order adopting this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a) and 6(e); *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.1992); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 30(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 30(a)(3), or with the similar provisions of Rule 30(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.

Dated: Rochester, New York
April 10, 1992

## REPORT AND RECOMMENDATION

### (Kastigar Motion)

Defendants Raggi, Harloff, Mazzeo and Alessi move to dismiss the indictment as against them on the ground that they gave immunized testimony to the Rochester Police Department ("RPD") Professional Standards Section ("PSS") in connection with incidents which are the subject of Counts 1, 18 and 19 of the indictment. They contend that their immunized testimony was given, with one exception, prior to the return of the indictment and that the government made improper use of their immunized testimony when it procured the indictment from the grand jury.

The motion was prompted by an October 28, 1991, letter from Department of Justice Attorney Cathleen M. Mahoney, Esq., to Harloff's counsel, John R. Parrinello, Esq., which revealed that the only statement given after the return of the indictment, Harloff's immunized statements to the PSS on September 20, 1991, came into the possession of RPD Lt. Michael Berkow, who was assigned to work with federal government investigators on this case. Berkow read a portion of the statement (the cover page only, according to his affidavit) and realized he should not be exposed to it. He sealed the statement in an envelope, and then mailed it to the Department of Justice in Washington where it was reviewed by a legal assistant not assigned to the case and thereafter maintained for safekeeping. Defendants also refer to another statement in the Mahoney letter which revealed that "PSS had previously provided us with use of force reports and subject resistance reports authored by your client which were produced to you on September 17, 1991." Defendants' motion papers, Exhibit J. From this, defendants conclude that there was a "direct channel of communication through which information flowed from [the] Professional Standards Section to the

federal grand jury investigation" and that the government cannot meet its burden to show that the indictment was obtained from sources independent of their immunized PSS testimony because there was no "Chinese–Wall" separating government investigators from exposure to the immunized statements. They cite *United States v. Schwimmer*, 882 F.2d 22, 26 (2d Cir. 1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990).

In response to the motion, the government submitted affidavits of each of its attorneys and investigators who participated in the investigation. Although not an original basis for defendants' motion, the government's papers revealed that RPD Captain Robert Duffy, who was intimately involved in the investigation leading to the indictment, had been exposed to Raggi's and Harloff's PSS testimony in the Fall of 1988 concerning an incident at 20 Barron Street, which is one of the many subjects of Count 1. According to Duffy's affidavit, he "sat on the Complaint Investigation Committee ("CIC") in 1988 that reviewed the PSS investigation of the incident at 20 Barons Street and in that capacity ... was exposed to the statements of defendants Raggi and Harloff." Duffy affidavit at ¶ 4. But Duffy maintains in his affidavit that the federal investigative team began their investigation resulting in the indictment well after 1988, and that it learned of the 20 Barron Street incident initially from an officer Robert Johanson on November 26, 1990; Duffy only recalled his role in the CIC some time thereafter and his recollection of the testimony was only that Raggi and Harloff denied the allegations.[1] Duffy could not then recall, and he still cannot recall, any details of the PSS testimony of either defendant. Duffy also states in his affidavit that he "did not provide any information derived from my participation on the CIC review of the 20 Barons St. incident to the investigators interviewing the officers for August, 1988, and ... did not

direct or aid their inquiry in any way." *Id.* at ¶ 10.

Duffy provided a similar scenario in regard to Raggi's testimony in May of 1988 to the PSS concerning an incident at 65 Prospect Street. Duffy states that the investigative team learned of this latter incident in June of 1991, during their debriefing of informant William Morris. Morris revealed the name of the victim which, when called to the attention of Duffy, "triggered [his] memory and [he] recalled that this was the same incident that [he] had reviewed on the CIC in 1988." *Id.* at ¶ 16. Similarly, however, Duffy denied specific recollection of the PSS testimony other than that he believed the officers generally denied the allegations.[2]

The other affidavits submitted by the government attorneys and investigators demonstrate no exposure whatsoever to the immunized PSS testimony. These affidavits reveal in particularized fashion the source of the investigative team's first knowledge of each incident that was the subject of the immunized testimony. In each case, the government's evidence is claimed to be independent from the immunized testimony.

■ The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." Under the rule in this circuit, *Uniformed Sanitation Men Association, Inc. v. Commissioner of Sanitation of the City of New York*, 426 F.2d 619 (2d Cir.1970) (Friendly, J.), *cert. denied*, 406 U.S. 961, 92 S.Ct. 2055, 32 L.Ed.2d 349 (1972); *see also, Asherman v. Meachum*, 932 F.2d 137, 145 (2d Cir.1991); *United States v. Oliveras*, 905 F.2d 623, 627 n. 6 (2d Cir.1990), the immunity these four defendants received when testifying before the Professional Standards Section must be coextensive with the scope of the Fifth Amendment privilege against self-incrimination. Although by judicial construction only, New

---

1. My independent review of the immunized testimony of each defendant, which was submitted *in camera* pursuant to an order dated February 18, 1992 (collecting authorities), confirms that the defendants denied the allegations.

2. My independent review of Raggi's PSS testimony submitted *in camera* confirms this view.

York confers immunity coextensive with the privilege in the circumstances presented here. *Matter of Matt v. LaRocca,* 71 N.Y.2d 154, 518 N.E.2d 1172, 524 N.Y.S.2d 180 (1987), *cert. denied,* 486 U.S. 1007, 108 S.Ct. 1734, 100 L.Ed.2d 197 (1988).

In *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court held that 18 U.S.C. § 6002, which is also coextensive with the scope of the Fifth Amendment privilege, "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." *Id.,* 406 U.S. at 453, 92 S.Ct. at 1661 (emphasis in original). Even "[b]efore *Kastigar,* the Court held in *Murphy v. Waterfront Commission,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), that the Fifth Amendment bars the use in a subsequent federal prosecution of compelled testimony obtained in state proceedings." *United States v. Helmsley,* 941 F.2d 71, 81 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1162, 117 L.Ed.2d 409 (1992). Under the rule of *Murphy* and *Kastigar,* a defendant " 'need only show that he or she testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence was derived from legitimate independent sources." *Braswell v. United States,* 487 U.S. 99, 117, 108 S.Ct. 2284, 2295, 101 L.Ed.2d 98 (1988) (quoting *Kastigar,* 406 U.S. at 461–62, 92 S.Ct. at 1665). *See United States v. Tantalo,* 680 F.2d 903, 907 (2d Cir.1982) ("[t]he fact that the appellant testified to matters related to his federal prosecution cast upon the Government the burden of establishing that the evidence to be used to prove his guilt was derived from legitimate sources.") "Whether the Government made use of immunized grand jury testimony is an issue of fact, ..." *United States v. Rivieccio,* 919 F.2d 812, 814 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991).

On the other hand, "[i]t is well established that such a witness may be prosecuted for such illegal acts if the prosecution is based solely on evidence obtained from independent sources." *United States v. Mariani,* 851 F.2d 595, 599 (2d Cir.1988), *cert. denied,* 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989). As summarized in *Mariani,*

> Where as witness is later prosecuted for an offense which was the subject of his testimony given under immunity, it is recognized that the government bears a heavy burden to show that the evidence it uses in the subsequent prosecution was not derived directly or indirectly from the witness' immunized testimony. To sustain this burden, we have held that the government must prove that it "relied solely on evidence from legitimate independent sources." *In re Corrugated Container Antitrust Litigation,* 644 F.2d 70, 76 (2d Cir.1981) (citing *Kastigar v. United States,* 406 U.S. at 460, 92 S.Ct. at 1664); *see United States v. Catalano,* 491 F.2d 268, 272 (2d Cir.), *cert. denied,* 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974).

*Id.,* 851 F.2d at 599–600. Dismissal of the indictment is not an available remedy, however, except in limited circumstances. It is clear that, at least where the federal immunity statute is concerned, misuse of immunized testimony in the procurement of an indictment will not result in dismissal of the indictment except in two carefully defined circumstances: (1) dismissal will be appropriate if a defendant testified under immunity before the same grand jury which returned the indictment or the immunized testimony is made known to the indicting grand jury; and (2) dismissal may be ordered when "the government concedes that the indictment rests almost exclusively on tainted evidence." *United States v. Rivieccio,* 919 F.2d at 816–17 n. 4. *Compare United States v. Pelletier,* 898 F.2d 297, 303 (2d Cir.1990) (collecting cases). Under the clear holding of *Rivieccio,* "a violation of either the privilege against self-incrimination or 18 U.S.C. § 6002 requires only the suppression at trial of a defendant's compelled testimony." *United States v. Rivieccio,* 919 F.2d at 816 (emphasis supplied) (adding that, in regard to "im-

munized testimony before a grand jury, generally the remedy for the violation is the suppression of the tainted evidence at trial, not a dismissal of the indictment"). *Compare United States v. Poindexter*, 951 F.2d 369, 377 (D.C.Cir.1991); *United States v. North*, 920 F.2d 940, 947–48 (D.C.Cir. 1990), *on rehearing from*, 910 F.2d 843 (D.C.Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991); *United States v. Pelletier*, 898 F.2d at 303. Accordingly, it is my Report and Recommendation that the motion to dismiss the indictment be denied. The proper focus of defendants' *Kastigar* motion is thus whether there is any evidence available to the government for use at trial which may be deemed "tainted evidence that [i]s subject to suppression" because of alleged misuse, directly or indirectly, of defendants' immunized testimony before the PSS. *United States v. Rivieccio*, 919 F.2d at 817.

In the peculiar circumstances of this case, particularly in view of the extensive affidavits submitted by the government lawyers and investigators considered together with my *in camera* review of defendants' immunized testimony, I find that the government has met its "heavy burden" of showing independent source and that defendants raise no issue of fact warranting a pre-trial *Kastigar* hearing. Of course, this determination is without prejudice to a renewed motion for a hearing if the trial of this matter suggests evidence to the contrary.[3]

First, defendants' immunized testimony concerning the alleged excessive force incidents generally denied wrongdoing and otherwise did not contain details which would not be in the RPD criminal files applicable to each incident, or in any of the police informant and victim debriefings. In *United States v. Gallo*, 863 F.2d 185 (2d Cir.1988), *cert. denied*, 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989), the court found from the "nature of Gallo's ... [immunized] testimony" that "any claim of its direct or indirect use [was] untenable." *Id.*, 863 F.2d at 190 ("testimony consisted mostly of denials and ambiguous answers" showing that "there was nothing to use"). The same approach has merit here. Second, in regard to the alleged overtime and workshift counts, there has been no showing that the substance of the PSS testimony on this issue came to the attention of any of the federal investigators. *United States v. Stockwell*, 743 F.2d 123, 127 (2d Cir.1984) ("the extent of the government's access to the defendant's statements would certainly be a factor to be considered in determining whether a *Kastigar*-type hearing is necessary to investigate the use made of the statements").

Third, defendants raise only an insubstantial and speculative possibility of taint. While it is true that the burden shifts to the government in a case such as this to prove independent source, the government may meet its burden with affidavits that are non-conclusory in form and do not simply ask the court to rely on the government's good faith. "While the Government clearly would not be entitled to rely entirely on one or two conclusory affidavits to carry its burden, *see United States v. Nemes*, [555 F.2d 51 (2d Cir.1977) ] ..., the Government made a much more detailed

---

**3.** The practice in this circuit appears to be that district courts "defe[r] the hearing on the motion until after trial." *United States v. Rivieccio*, 919 F.2d at 814; *United States v. Mariani*, 851 F.2d at 597 (same). *See also, United States v. Helmsley*, 941 F.2d at 80 (the trial judge "postponed the question until the completion of trial, at which time he could determine with the benefit of trial evidence whether there was a sufficient nexus between the immunized testimony and the federal prosecution to warrant a hearing"). In *United States v. Tantalo*, the court observed that "[i]t was within the district court's discretion to determine whether the taint hearing should be held before trial as in [*United States v.*] *Kurzer*, [534 F.2d 511, 516 (2d Cir.

1976) ]; during the course of trial as evidence was presented; after verdict by way of a post-trial motion; or as suggested in *United States v. DeDiego*, 511 F.2d 818, 824 (D.C.Cir.1975), a combination of these alternatives." *Id.* 680 F.2d at 909. *But compare United States v. North*, 910 F.2d 843, 854 (D.C.Cir.1990) (recognizing *DeDiego's* holding that "a trial court may hold a *Kastigar* hearing pre-trial, post-trial, mid-trial (as evidence is offered), or it may employ some combination of these methods.... [but finding that a] pre-trial hearing is the most common choice"), *modified on other grounds*, 920 F.2d 940 (D.C.Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991).

presentation here, and did not attempt to invoke reliance merely on the good faith of the prosecutor, *see Kastigar, supra,* 406 U.S. at 460 [92 S.Ct. at 1664], in order to negate taint." *United States v. Romano,* 583 F.2d 1, 8 (1st Cir.1978) (adding that "[m]uch obviously depends on all the facts and circumstances of a particular case"). Although a hearing was held in *Romano,* there are enough examples within this circuit of district court denials of *Kastigar* motions without a pre-trial hearing to illustrate the merit of the view that one should not be ordered in this case until trial, or until other evidence is proffered raising an issue of fact concerning the content of the government's affidavits. *See e.g., United States v. Helmsley,* 726 F.Supp. 929, 933–34 (S.D.N.Y.1989), *aff'd,* 941 F.2d 71, 79–83 (2d Cir.1991), *cert. denied,* ⸺ U.S. ⸺, 112 S.Ct. 1162, 117 L.Ed.2d 409 (1992); *United States v. Biaggi,* 909 F.2d 662, 689–90 (2d Cir.1990), *cert. denied,* ⸺ U.S. ⸺, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991) ("declining, after assessing the entire trial record, to hold a '*Kastigar* hearing' "). As observed by the District of Columbia Circuit in *North,* "to be entitled to a hearing on whether immunized testimony was before the grand jury, a defendant must lay a firm 'foundation' resting on more than 'suspicion' that this may in fact have happened." *United States v. North,* 920 F.2d at 949 n. 9 (quoting *Lawn v. United States,* 355 U.S. 339, 348–49, 78 S.Ct. 311, 317–18, 2 L.Ed.2d 321 (1958)). As in *Lawn,*

> The affidavits submitted in support of and in opposition to the motion for the requested hearing disclosed, as found by the trial court and the Court of Appeals, with which findings we agree, that petitioners had no reason, beyond suspicion, to believe that the ... grand jury considered any of the [immunized] materials.... These facts make clear that petitioners laid no foundation for the holding of a protracted preliminary hearing (at which they would, in effect, take the

depositions of the Government's witnesses) to determine whether there was any substance to their suspicion that some direct or derivative use may have been made ... of [the immunized] materials....

*Lawn v. United States,* 355 U.S. at 348–49, 78 S.Ct. at 317. The only aspect of the case that gives pause is Duffy's admission that he was previously exposed to some immunized testimony given three years before the investigation leading to this indictment began. But since Duffy claims "no recollection of the contents of defendant's immunized testimony," he "could [not] possibly make any use of it." *United States v. Poindexter,* 727 F.Supp. 1488, 1496 (D.D.C.1989), *overruled on other grounds,* 951 F.2d 369, 373–77 (D.C.Cir.1991).

Finally, defendants contend that the government failed to erect a Chinese wall between it and the PSS unit. This contention is without merit. In *Schwimmer,* the case cited by defendants, the government attorneys were, or would be, familiar with the "substance" of the immunized testimony. This knowledge was the primary ingredient motivating the prudent suggestion that the government "establish a so-called 'Chinese wall' between its prosecutors exposed to the present grand jury testimony ... and those prosecutors who may be assigned to retry defendant." *United States v. Schwimmer,* 882 F.2d at 26. In this case, on the other hand, there is no showing that the prosecutors and investigators responsible for this prosecution have any knowledge of the substance of the coerced testimony,[4] and the government's uncontradicted and unimpeached affidavits clearly show to the contrary. In such a circumstance, the need for a pretrial, as opposed to a trial or post-trial *Kastigar* hearing if an issue of fact is raised by defendants upon the trial, is not apparent.

---

4. Defendants show only that Lt. Berkow and a ministerial employee not connected with the investigation were exposed to the contents of packages sent to Washington which contained a transcript of the immunized testimony, and that Duffy's exposure was long forgotten (see above).

Berkow read only the cover sheet and the handling by a Department of Justice employee demonstrates scrupulous adherence to the Chinese Wall concept. Nobody else is shown to have been exposed.

CONCLUSION

Accordingly, it is my Report and Recommendation that the motion to dismiss the indictment be denied without a hearing; that the motion to suppress unspecified tainted evidence be denied and that the motion for a pre-trial *Kastigar* hearing be denied without prejudice to renewal of the motion to suppress if trial or other evidence raises an issue of fact that the government misused the PSS testimony.

The parties should be on notice that, pursuant to 28 U.S.C. § 636(b)(1)(C) and Local Rule 30(a)(3), any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt thereof. Failure to file objections within the specified time waives the right to appeal a District Court Order adopting this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a) and 6(e); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 30(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 30(a)(3), or with the similar provisions of Rule 30(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.

Dated: Rochester, New York