**UNITED STATES of America,**

v.

**Nicholas MAURO, et al., Defendants.**

**No. 92–CR–15S.**

United States District Court,
W.D. New York.

Feb. 23, 1994.

---

Patrick C. NeMoyer, U.S. Atty. by Anthony M. Bruce, Asst. U.S. Atty., Buffalo, NY, for U.S.

Kenneth F. Hense, McGlynn, Reed, Hense & Pecora, Point Pleasant, NJ, for defendant Nicholas Mauro.

Paul Volcy, Buffalo, NY, for defendant Frank Stasio.

Frank Haddad, Louisville, KY, for defendant Ben Rogers.

John J. Molloy, West Seneca, NY, for defendant Joseph Giallella.

## DECISION AND ORDER

SKRETNY, District Judge.

### *INTRODUCTION*

Presently before this Court is defendant Ben Rogers' pre-trial motion to suppress all evidence obtained by the government directly or indirectly through testimony elicited from him pursuant to a grant of use and derivative-use immunity under 18 U.S.C. § 6002. Defendant argues that this evidence is inadmissible according to the principles enunciated in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The government argues that all of its anticipated evidence was obtained from legitimate sources independent of Rogers' immunized testimony and, as such, it is admissible according to *Kastigar.*

In support of his motion, defendant Rogers has submitted a Motion in Limine ("D. Motion"); a Memorandum of Authorities in Support of Defendant's Motion in Limine ("D. Memo"); a Supplemental Reply to Government's Surresponse Served January 20, 1994; and a letter dated May 13, 1993 clarifying certain information contained in defendant's Memorandum of Law.

In opposition to defendant's motion, the government has submitted a Response to Defendant Rogers's Motion for a Kastigar Hearing ("G. Response"); and a Surresponse to the Defendant's May 28, 1993 Reply to the Government's Response to the Defendant's Motion for a Kastigar Hearing ("G. Surresponse").

As discussed below, this Court conducted a *Kastigar* hearing on February 8, 1994 to determine whether the government had legitimate independent sources for its proof against defendant Rogers. In preparation for that hearing, the government submitted an Affidavit and Response to Kastigar Motion of Defendant Ben Rogers prepared by Assistant United States Attorney Martin J. Littlefield, with exhibits ("Littlefield Affid."); an Affidavit of Assistant United States Attorney Anthony M. Bruce ("Bruce Affid."); an Affidavit of Assistant United States Attorney William J. Knapp ("Knapp Affid."); and an Affidavit of Special Agent Dean G. Naum of

the Federal Bureau of Investigation ("Naum Affid.").

During the *Kastigar* hearing, the government's case was presented by Littlefield, who introduced the testimony of Naum and Bruce. Defendant Rogers' counsel conducted cross-examination of these witnesses. Furthermore, the government introduced a number of exhibits: a copy of Rogers' June 10, 1982 immunized grand jury testimony ("Exh. A"); a transcript of Rogers' July 9, 1984 immunized testimony provided during the trial of Nicholas Mauro ("Exh. B"); a copy of the present Superseding Indictment ("Exh. C"); a copy of the government's exhibit list pertaining to the upcoming trial ("Exh. D"); a copy of a December 6, 1989 wiretap application ("Exh. F"); a copy of a second wiretap application dated January 26, 1990 ("Exh. G"); a search warrant application dated February 3, 1990 ("Exh. H"); and a report from the FBI office in Louisville, Kentucky to the FBI office in Buffalo, New York concerning defendant Rogers ("Exh. I"). The government did not introduce a copy of its witness list pertaining to the upcoming trial; however, a copy is attached as an exhibit to the Littlefield Affidavit ("Exh. E").

After considering all these submissions, as well as the testimony elicited during the *Kastigar* hearing, this Court will deny defendant's motion to suppress evidence for the reasons discussed below.

### FACTS

On June 10, 1982 defendant provided testimony before a federal grand jury investigating the activities of one of defendant's present codefendants, Nicholas Mauro. In February 1983 the grand jury returned a four-count indictment charging Mauro with filing false tax returns, and with conspiracy to engage in interstate bookmaking, to commit bank fraud, and to defraud the United States. On July 9, 1984, at Mauro's trial,

defendant Rogers testified about the nature of sports gambling in general, and about his gambling relationship with Nicholas Mauro. Both Rogers' grand jury testimony and trial testimony were elicited under a court-ordered grant of immunity pursuant to § 6002. Assistant United States Attorney Anthony M. Bruce examined Rogers before the grand jury, and represented the government during the trial of Nicholas Mauro. However, during Mauro's trial, Rogers was examined by Assistant United States Attorney William J. Knapp. Mauro was convicted on all four counts of the indictment.

Thereafter, on January 16, 1992 another federal grand jury returned an indictment naming Rogers, Mauro, and five other codefendants. Counts I and II of the indictment charged each of the defendants with conducting an illegal gambling business and conspiracy, during the period of April 16, 1981 to March 1, 1990, in violation of 18 U.S.C. §§ 1955, 371 and 2. This period encompassed the times at which Rogers provided his immunized grand jury and trial testimony. Furthermore, Counts IX and X charged defendant Nicholas Mauro with violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") in connection with his gambling activities, pursuant to 18 U.S.C. § 1961 *et seq.* One of the RICO predicate offenses alleged in Counts IX and X was the gambling crime alleged in count II.[1] Bruce presented the government's case to the grand jury, and is assigned to represent the government during the imminent trial involving defendant Rogers.

On September 17, 1992, shortly after defendant Mauro moved to dismiss Counts I, II, IX, and X on double jeopardy grounds, the present Superseding Indictment was returned. The Superseding Indictment is identical to the indictment returned on January 16, 1992; however, the first date listed in Counts I and II is now July 18, 1985. Thus

---

1. In addition, Counts III through VIII of the indictment charged defendant Nicholas Mauro with mail fraud, making false statements to the United States Department of Health and Human Services, and conspiracy. Counts III through VIII were severed from Counts I, II, IX, and X by the consent of the parties, pursuant to an order

of Hon. Edmund F. Maxwell, United States Magistrate Judge for the Western District of New York, entered on March 16, 1993. On February 4, 1994 Mauro was convicted on Counts III through VIII after a jury trial held before this Court.

the period of criminal activity alleged in Counts I and II no longer encompasses the times at which defendant Rogers provided his immunized testimony.

In his Affidavit, FBI Special Agent Naum avers that he headed the investigation leading to the present Superseding Indictment, which began in late 1988. He states that at no time during the course of the investigation was he aware that Rogers had testified before a federal grand jury in June 1982 or at the trial of Nicholas Mauro in July 1984. He states that the first time he learned of such testimony was in connection with the present *Kastigar* motion. He indicates that he has never reviewed such testimony, and has no information regarding the contents thereof. Finally, he states that in the wiretap and search warrant applications mentioned above (which he assisted in preparing), there is no mention of Rogers' immunized testimony.

Bruce states in his Affidavit that he has overseen the presentation of this case to the grand jury and the preparation of this case for trial. He states that in June 1982 he had the occasion to subpoena Rogers before a federal grand jury investigating the bookmaking activities of Nicholas Mauro and other individuals. He indicates that he had learned of Rogers from investigations conducted by the Internal Revenue Service involving Mauro's bookmaking activities. Bruce attests that at that time he possessed the following information about Rogers:

 a. Nicholas Mauro was known to have an ownership interest in a hotel in the Miami area during the late '70s and early '80s. A review of records from that hotel revealed that a Mrs. Carol Goldberg of Louisville, Kentucky had stayed at Mauro's hotel free of charge.

 b. Further investigation revealed that Mrs. Goldberg was the daughter of Ben Rogers.

 c. Inquiry of IRS Special Agents in the Louisville area revealed that Ben Rogers was a well known bookmaking figure in the Louisville area.

 d. Subpoenaed bank records had revealed a $5,000 official bank check issued to a restaurant known to be controlled by Ben Rogers (although ownership was listed in his wife's name) with the remitter being Nicholas Mauro.

(Bruce Affid. ¶ 4). Bruce avers that the investigation that led to the present Superseding Indictment commenced in late 1988, and originally pertained solely to the activities of Nicholas Mauro and his associates in the Western New York area. Bruce writes, "The investigative file was opened based upon source information indicating that Nicholas Mauro was about to be released from jail and that he had already begun to make preparations to reassert day-to-day control over his bookmaking enterprise...." (*Ibid.* ¶ 6). Bruce indicates that the investigation involved wiretaps of phones used by Mauro's alleged bookmaking operation, and the execution of search warrants.

However, Bruce states that he was not involved in the investigation, and that the investigation was supervised by Knapp. Bruce writes that he was assigned to the Rochester, New York office of the Justice Department's Organized Crime Strike Force, and was only "vaguely aware" of the Mauro investigation. (*Ibid.* ¶ 7). He understands that Rogers was not originally a target of the investigation, but became a target only after he was overheard during wiretapped telephone conversations that allegedly involve him in Mauro's bookmaking activities. Rogers was identified through pen registers placed on Mauro's phones. Furthermore, Bruce indicates that since the investigation began, an individual by the name of Peter Spero has been an associate of Mauro, and has possessed extensive information about Mauro's bookmaking activities.[2] Moreover, the wiretaps and other aspects of the investigation revealed other Mauro associates, including one Dana Iser. Bruce concludes his Affidavit by stating:

 I wish to state absolutely and unqualifiedly that I did not use, directly or indirectly,

---

[2] Peter Spero was charged in the Superseding Indictment, together with his son, Timothy Spero. The charges against Peter and Timothy Spero have been resolved through a plea agreement between the government and Peter Spero, who is expected to testify against Nicholas Mauro during the upcoming trial.

any of the 1982 Grand Jury testimony, nor any of the 1984 trial testimony of Ben Rogers during the course of the investigation that led to the return of indictment. As can be seen from the wire tap applications attached to the affidavit of Assistant United States Attorney Martin J. Littlefield, no mention was made of the aforesaid testimony and, thus, there is no possible link between Rogers' testimony and obtaining evidence via the wire tap applications. Furthermore, while it is anticipated that Peter Spero and Dana Iser will provide testimony during the course of trial linking Nicholas Mauro's activities in the Western District of New York to Ben Rogers, the existence of these two individuals was not derived from Ben Rogers' 1982/1984 testimony in any fashion.

(Bruce Affid. ¶ 10).

Knapp states in his Affidavit that he was involved in the early part of the investigation leading to the present Superseding Indictment, including the preparation of the wiretap and search warrant applications. He states that at the beginning of the investigation, the only targets were Nicholas Mauro and his associates in the Western New York area. Rogers became a target only after he was overheard during wiretapped telephone conversations in late 1989 and 1990. Knapp avers that at no time during the investigation did he use any of Rogers' immunized testimony, nor did he recall the existence of such testimony beyond a general knowledge that Rogers had been associated with Mauro. Knapp writes, "At no time did I discuss with Special Agent Dean Naum, the agent in charge of the present investigation/indictment, the contents or even the existence of the aforesaid Grand Jury/trial transcripts." (*Ibid.* ¶ 5). Finally, Knapp refers to the wiretap and search warrant applications (Exhs. F, G, and H), indicating that "there was absolutely no use of nor reference to the aforesaid transcript nor was any information

derived from that testimony and used in this investigation." (*Ibid.* ¶ 6).

Littlefield states in his Affidavit:

Mr. Bruce has advised me that the total evidence against Ben Rogers will consist of the following:

a. Use of the 1989–1990 wire tap;

b. Use of certain physical evidence seized in the execution of the February 1990 Search Warrants;

c. Agent testimony to the effect that Pen Registers were placed on phones in the Western District of New York showed calls to and from phones listed to Ben Rogers during 1989–1990; [3]

d. Testimony from witness Peter Spero stating that he has known the defendant Nicholas Mauro for an extensive period of time and that he has been heavily involved in Mauro's book making operations in the Western District of New York.

e. Spero will also testify that during the course of that relationship, Mauro and his associates had been in regular contact with Ben Rogers to obtain betting lines and to "lay off" bets.

f. Testimony of witness Dana Iser who will testify that he was a writer in the Mauro organization and that from time to time during 1988–1989 he would take calls from Ben Rogers regarding the betting activities of Nicholas Mauro.

(Littlefield Affid. ¶ 14). With respect to Rogers' immunized testimony, Littlefield notes that the testimony was limited in scope, and largely pertained to the nature of gambling and bookmaking in general. He claims that there are no "evidentiary leads" therein, such as phone numbers, addresses, or names of other individuals. Otherwise, the testimony simply confirmed information that the government possessed prior to subpoenaing Rogers. Finally, Littlefield argues that the principles contained in *Kastigar* are intended to prohibit the use of immunized testimony against a witness only for crimes

---

**3.** This statement is technically inaccurate because, as Bruce testified at the *Kastigar* hearing, pen registers are capable of recording only the telephone numbers dialed on a tapped phone; they are incapable of recording the telephone numbers of phones from which calls to the tapped phone were made.

that were committed prior to the testimony. The government contends that because the period of criminal activity alleged in Counts I and II of the Superseding Indictment began on July 18, 1985, after Rogers provided his immunized testimony, *Kastigar* has no application to the present case.

During the *Kastigar* hearing held before this Court, Naum and Bruce testified about their involvement in the present case. Naum reiterated many of the statements contained in his Affidavit. Furthermore, Naum testified that he acquired information concerning Rogers' involvement in Mauro's bookmaking operations through intercepted conversations between Peter Spero and one Fred Saia. During these conversations, Peter Spero and Saia referred to an individual named "Homer." Naum initiated a search for that name in FBI records, and received a report from the FBI's Louisville, Kentucky office. That report, Exhibit I, states:

> For information of Buffalo, Louisville has maintained 16 separate investigative matters consisting of over 40 volumes total over a 22–year period involving Ben "Sonny" Rogers, aka Homer. Exhaustive review by Louisville has established that Rogers has had contact with Luther James (LS 183C–823), Frank Gaines, James Beasley, and Sammy Marilla, all well-known and established bookmakers and drug dealers in the Louisville area, over a period of 15–20 years.
>
> Information from a review of 182B–869 listed Rogers as being described as a white male ... DOB: October 30, 1927; POB: Harlan Kentucky; Height: six feet; weight: 200 pounds; hair: black; eyes: gray ... and living at ...' Louisville Kentucky.... [P]rior arrests include 1966 by FBI when he pled guilty to one count of conspiracy and paid a $5,000 fine. On September 10, 1975, Rogers was arrested by FBI and pled guilty to one count illegal gambling business. Rogers paid a $10,000 fine for that violation. Source information indicated that throughout the gambling community, this fine was made light of when Rogers was sentenced on June 2,

> 1976, before U.S. District Court Judge Charles M. Allen, Western District of Kentucky, at Louisville, Kentucky. No incarceration period was listed. In light of the fact that gambling is illegal in the Commonwealth of Kentucky, convictions routinely have brought fines with no time to serve. Rogers was charged on November 21, 1984, with conspiracy to conduct illegal gambling and using a telephone to facilitate unlawful activity. Charges originated out of Louisiana (No. 182B–929).
>
> Inquiries through two credit bureaus give conflicting addresses for Rogers. The [Louisville, Kentucky] address is still on file locally. However, a second agency indicated Rogers renewed his driver's license in Nevada ... as of March, 1988....
>
> Louisville will coordinate with Buffalo to verify Rogers' involvement in instant matter via FISUR support by OCDETF members.
>
> ....
>
> ... Investigation continues at Louisville.

Naum testified regarding the affidavits he prepared on December 6, 1989 (see Exh. F) and January 26, 1990 (see Exh. G) in support of wiretap applications, and the affidavit he prepared on February 3, 1990 in support of a search warrant application (Exh. H). Naum testified that Rogers was overheard during conversations intercepted pursuant to the January 1990 wiretap, which included new telephone numbers, based on information obtained during the December 1989 wiretap. Information regarding Ben Rogers, a/k/a "Homer", is contained at paragraphs 29 and 91–93 of Naum's December 6, 1989 affidavit. The affidavit contains no allusion to Rogers' immunized testimony. In fact, the basis for Naum's knowledge about Rogers' relationship with Nicholas Mauro appears to have been a 1983 New York State Police wiretap of Mauro's telephones, during which Rogers and Mauro were overheard exchanging line information. These telephone calls were placed from Mauro in Niagara Falls, New York to Rogers in Louisville, Kentucky.[4]

---

4. It is interesting to note that at paragraph 96 of the December 1989 affidavit (Exh. F), Naum justifies the need for a wiretap by writing, "Subjects of the investigation, should they be called to testify, would most likely invoke their Fifth Amendment privileges and refuse to testify...."

Similarly, Naum's February 1990 search warrant affidavit makes no reference to Rogers' immunized testimony.

Bruce also testified at the *Kastigar* hearing. On direct examination he reiterated much of the information contained in his Affidavit. Bruce further testified that he first saw a transcript of Rogers' 1982 grand jury testimony shortly after that testimony was taken. He reviewed that testimony prior to Nicholas Mauro's 1984 trial. Bruce did not review it again after the 1984 trial, nor did he provide the transcript to anyone but Rogers' attorneys in connection with the present case. In the meantime, the transcript of Rogers' grand jury testimony has been kept in a locked cabinet in the United States Attorney's Office, and has not been disturbed.

Bruce stated that he heard Rogers testify during the 1984 trial, and read the trial transcript in its entirety in late 1984 or early 1985, in connection with Mauro's appeal of his 1984 conviction. He did not review it thereafter, even in connection with Rogers' *Kastigar* motion.

Bruce indicated that he became involved in the present investigation in the late winter or early spring of 1990. He stated that he never discussed Rogers' immunized testimony with Special Agent Naum, and that by the time he became involved with the investigation, Rogers had already become a target of the investigation. Bruce stated that he did not know whether Rogers was originally a target when the investigation began in 1988. Bruce indicated that all the physical evidence that will be used against Rogers during trial will be derived from the wiretaps or search warrants. Bruce disclosed no immunized testimony in connection with the government's application for pen registers. He testified that he knew about Peter Spero's involvement with Nicholas Mauro for many years, and that this information was not derived from Rogers' immunized testimony. Finally, he stated that he did not learn of

Dana Iser's involvement through the immunized testimony.

On cross-examination, Bruce testified that Rogers' grand jury testimony did not provide him with any information that he did not have prior to obtaining that testimony. He stated that the government was previously aware of the existence of "Homer" through the Louisville IRS office. In connection with the present investigation, Bruce learned about Rogers' involvement when he reviewed the conversations intercepted during the wiretaps.

## DISCUSSION

### Legal Standards

Defendant Rogers' 1982 grand jury testimony and 1984 trial testimony were obtained under a court-ordered grant of immunity, pursuant to 18 U.S.C. § 6002, which provides, in relevant part:

> Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—
>
> (1) a court or grand jury of the United States ...
>
> . . . . .
>
> ... and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

The constitutionality of § 6002 was upheld in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In *Kastigar*, the Supreme Court determined that the statute did not violate the Fifth Amendment,

It would be unwise to seek Grand Jury immunity for any of the subjects named herein, as it would foreclose prosecution of the most culpable persons." This statement lends credence to Naum's

contention that he had no knowledge of Rogers' immunized testimony in connection with the previous investigation and conviction of Nicholas Mauro.

and elaborated on the prohibition against using immunized testimony against the witness in a subsequent criminal prosecution. The Court held that the immunity provided by § 6002 leaves the witness in the same position as if he had invoked his privilege against self-incrimination, and that the scope of the statute's grant of immunity is coextensive with the scope of the Fifth Amendment privilege. *Id.* at 462, 92 S.Ct. at 1666. The Court wrote:

Petitioners argue that use and derivative-use immunity will not adequately protect a witness from various possible incriminating uses of the compelled testimony: for example, the prosecutor or other law enforcement officials may obtain leads, names of witnesses, or other information not otherwise available that might result in a prosecution. It will be difficult and perhaps impossible, the argument goes, to identify, by testimony or cross-examination, the subtle ways in which the compelled testimony may disadvantage a witness, especially in the jurisdiction granting immunity.

This argument presupposes that the statute's prohibition will prove impossible to enforce. The statute provides a sweeping proscription of any use, direct or indirect, of the compelled testimony and any information derived therefrom....

. . . .

... This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an "investigatory lead," and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures.

*Id.* at 459–60, 92 S.Ct. at 1664–65.

The *Kastigar* Court also stated that a witness who has been afforded immunity under § 6002 is not dependent on the good faith of the government for the preservation of his rights. The Court held:

One raising a claim under this statute need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources.

*Id.* at 461–62, 92 S.Ct. at 1665.

 The government's "heavy burden" is not satisfied by the government's mere assertion that the immunized testimony was not used. *United States v. Tantalo,* 680 F.2d 903, 908 (2d Cir.1982); *United States v. Nemes,* 555 F.2d 51 (2d Cir.1977). However, the government "may meet its burden with affidavits that are nonconclusory in form and do not simply ask the court to rely on the government's good faith." *United States v. Harloff,* 807 F.Supp. 270, 282 (W.D.N.Y. 1992). Likewise, the government may show a legitimate independent source by proving that it knew the information disclosed during the immunized testimony before that testimony was provided. *See United States . v. Bianco,* 534 F.2d 501 (2d Cir.), *cert. denied,* 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). This presents an issue of fact for the Court's determination. *United States v. Rivieccio,* 919 F.2d 812, 814 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991).

The Second Circuit has emphasized that the primary focus of *Kastigar's* prohibition on direct or indirect use of immunized testimony is on *evidentiary* use. In *United States v. Mariani,* 851 F.2d 595 (2d Cir. 1988), *cert. denied,* 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989), the court explicitly declined to follow *United States v. McDaniel,* 482 F.2d 305 (8th Cir.1973) and similar cases holding that § 6002 forecloses the prosecution of an immunized witness where his immunized testimony might have tangentially influenced the prosecutor's thought processes in preparing the indictment and preparing for trial. *Id.* at 599 (section 6002 "clearly prohibits *evidentiary* direct or indirect use of the witness's testimony.") (emphasis added). *See also United States v. Schwimmer,* 924 F.2d 443 (2d Cir. 1991); *Rivieccio,* 919 F.2d at 815 ("To the extent the Government's thought process or questioning of witnesses may have been influenced by Appellant's immunized testimony, we hold that any such use was merely tangential and was therefore not a prohibited use."). In *Mariani,* the court wrote, "[W]e

cannot see how the government prosecutor's knowledge of Mariani's immunized testimony could be considered impermissible use of that testimony." *Mariani,* 851 F.2d at 600.

■■■ There is even authority suggesting that the government's "heavy burden" under *Kastigar* does not apply when nonevidentiary use is examined. *See United States v. Helmsley,* 726 F.Supp. 929, 932–33 (S.D.N.Y. 1989) (relying on *United States v. Poindexter,* 698 F.Supp. 300, 306–307 (D.D.C.1988)), *aff'd in relevant part,* 941 F.2d 71 (2d Cir. 1991). Because this principle has not expressly been adopted by the Court of Appeals, this Court does not consider it decisive; however, it is nonetheless instructive insofar as it demonstrates that § 6002 is concerned primarily with the evidence that will be used against the defendant at trial.[5] Consequently, a defendant's speculation about the more "subtle effects" of a prosecutor's knowledge of the immunized testimony will not stand in the way of the government's prosecution of defendant.

The government argues that § 6002 has no proactive application, and that the statutory grant of immunity can only relate to past criminal activities about which defendant testified. The Second Circuit has viewed the statute somewhat more broadly, particularly in cases such as this, where there is an indication of ongoing criminal activity. In *United States v. Gallo,* 859 F.2d 1078 (2d Cir.1988), *cert. denied,* 490 U.S. 1089, 109 S.Ct. 2428, 104 L.Ed.2d 986 (1989), defendant Miron was indicted together with fifteen co-defendants, and was convicted of participating in the Gambino Crime Family through a pattern of racketeering activity, consisting of Taft–Hartley violations and obstruction of justice. He was also convicted on substantive Taft–Hartley and obstruction of justice charges. Prior to trial, Miron moved to dis-

miss the indictment against him because he had previously provided immunized testimony under § 6002.

Miron had given testimony before a federal grand jury in connection with a criminal investigation of Teamsters official John Cody. Miron testified regarding Cody's contacts with the Gambino Crime Family, including Paul Castellano. Cody was indicted and convicted. Subsequently, however, Miron was indicted in the *Gallo* case, and Castellano and two other labor union officials were named as unindicted coconspirators. It appears that the Assistant United States Attorney who obtained Miron's grand jury testimony provided Miron's testimony to Cody's probation officer for preparation of Cody's presentence report. The report indicated that Miron's testimony regarding the Miron–Castellano–Cody relationship "corroborated" information provided by FBI informants as to the Cody–Castellano relationship. At approximately the time of Cody's sentencing, the government initiated a series of applications for electronic bugging of the home of Paul Castellano. In one of these applications, the FBI agent indicated that the Assistant United States Attorney had told him about Miron's grand jury testimony, and that the testimony indicated that Castellano was involved in illegal activity.

In moving to dismiss the indictment, Miron argued that the information he provided during his grand jury appearance was used by the government to develop leads and to focus an investigation on Miron. The trial court refused to dismiss the indictment because the conspiracy in which Miron was alleged to have joined did not begin until after the immunized testimony was provided, and because there was so much additional evidence supporting the government's wiretap applica-

---

5. As the Second Circuit noted in *Rivieccio,* the remedy available for misuse of immunized testimony is suppression of the improperly obtained evidence at trial. *Rivieccio,* 919 F.2d at 816. Misuse of the testimony in obtaining an indictment will warrant dismissal of the indictment in only two limited circumstances: (1) where the defendant testified under immunity before the same grand jury that returned the indictment against him, or the immunized testimony is disclosed to the indicting grand jury; and (2) where

the government concedes that the indictment is based almost exclusively on improperly obtained evidence. *Id.* at 816–17 n. 4. *See also Harloff,* 807 F.Supp. at 281. Although in the present case the government did not offer the grand jury minutes relating to the present charges against defendant Rogers, the clear implication of the testimony and evidence presented in connection with Rogers' *Kastigar* motion is that neither of these circumstances exists here.

tions and investigation in general that the immunized testimony could not have made a real difference. The court noted, "If in fact the grand jury is investigating prior crimes and not the continuing criminality of the person granted immunity, the compelled grand jury testimony should later be directly admissible in proving future criminality." *U.S. v. Gallo,* 671 F.Supp. 124, 136 (E.D.N.Y. 1987). Furthermore, the court wrote:

> Even if the interpretation of immunity law to exclude future independent crimes grants insufficient protection to those who are granted immunity, so that the testimony in question here was immunized as to the [prior] crimes, no violation of any right of Miron has been shown. It is apparent that the government would have acted exactly as it did, and no judge of this court would have deviated in the slightest from the course of granting orders authorizing the bugs that revealed information incriminatory to Miron.

*Id.* at 138.

Although the Second Circuit ultimately affirmed the district court's holding in *Gallo,* it in fact determined that the use of Miron's immunized testimony violated § 6002 and the Fifth Amendment. Judge Winter wrote for the court:

> The government argues, however, that because the crimes committed by Miron occurred after he gave his immunized testimony, the use of that testimony in securing the indictment and his conviction violates neither the statute nor the fifth amendment. I do not discern in relevant Supreme Court decisions such a broad principle....
>
> ... The grand jury here was gathering information about ongoing criminal activity involving labor racketeering, and the information it gathered was available to federal law enforcement officials. In a real sense, therefore, testimony by Miron regarding his business, which was closely related to the construction industry and involved union contracts, his relationship with Cody, who was the subject of the investigation, and his relationship with Castellano, who was a widely-reputed organized crime boss, disclosed "links in a chain of evidence," (citation omitted) that were potentially incriminating both as to past and future crimes arising out of the activity being investigated. The very use of Miron's immunized testimony in the application for an extension and expansion of the surveillance authorization demonstrates the testimony's inculpatory nature.... [A]pplication of an inflexible chronological test in the present circumstances would open avenues of evasion, by allowing a grand jury investigating ongoing criminal activity to immunize a person so as to obtain testimony that would thereafter support probable cause for electronic surveillance of that person. Moreover, *because labor racketeering is, like gambling, generally an ongoing activity, a substantial risk of incrimination attends the questioning of persons in situations similar to Miron's.* I thus conclude that the use of Miron's immunized testimony violated the use-immunity statute and the fifth amendment.

859 F.2d at 1082–83 (emphasis added). Nonetheless, the court upheld Miron's conviction, finding that the violation of Miron's rights had no effect on the course of events leading to his indictment and conviction. Therefore, the court determined that the error was harmless.

The principles discussed by the Second Circuit in *Gallo* are germane to the present case. Here, the Superseding Indictment suggests that defendant Rogers engaged in ongoing criminal activity. The government's investigation uncovered a prior association with Nicholas Mauro's bookmaking operations. Indeed, Count I of the original indictment returned in this case alleged that Rogers joined in a conspiracy to engage in an illegal gambling business that extended back to April 16, 1981: prior to the dates of Rogers' compelled testimony. Furthermore, the government has indicated:

> ... [W]ith respect to Counts One and Two, the Government hereby serves NOTICE that, although conduct by the defendants from 1981 to July 16, 1985 that was violative of New York Penal Law § 225.00, *et seq.* is, under the superseding indictment, "uncharged," the Government intends to

use that conduct at trial to prove, *inter alia,* motive, opportunity, intent, preparation, plan, knowledge, and identity.

(Government's Consolidated Responses to the Defendants' Omnibus Pre–Trial Motions, October 1, 1992, p. 3). It appears that, according to the government's own statements, the government intends to use information it obtained prior to the dates of Rogers' immunized testimony. Therefore, this Court has been especially sensitive to any possibility that Rogers' testimony was exploited in a way that violated his privilege against self-incrimination.

Moreover, Bruce's prosecution of this case has caused this Court to examine the government's anticipated evidence with particular scrutiny. Defendant Rogers strenuously argues that Bruce should not be allowed to represent the government in the present case, due to his exposure to Rogers' immunized testimony. Although this Court does not find that Bruce should be barred from continuing to prosecute this case, this factor has had a significant impact on this Court's consideration of defendant's *Kastigar* motion. In future cases, the government may wish to avoid the appearance of impropriety by constructing a "Chinese Wall" around prosecutors who have been exposed to immunized testimony. The Second Circuit recommended this practice in *Schwimmer,* in which the court was presented with the possibility of a retrial of a case after the defendant was convicted and immediately subpoenaed to testify before a grand jury investigating activities relating to the offense of conviction. The court held that the defendant could be required to provide the immunized testimony prior to his appeal. Nonetheless, the court wrote:

> Without deciding the issue, it would appear prudent for the government in the event of a retrial to establish a so-called "Chinese Wall" between its prosecutors exposed to the present grand jury testimony—the ordering of which is the subject of this appeal—and those prosecutors who may be assigned to retry defendant. *See United States v. Semkiw,* 712 F.2d 891, 895 (3d Cir.1983) (adopting such approach); U.S. Dep't of Justice, United States Attorneys'

Manual § 1–11.400, at 21 (1987) (to demonstrate that *no* non-evidentiary use has been made of the compelled testimony, prosecution would be handled by an attorney unfamiliar with its substance).

*Id.* at 26.

The relevant portion of the United States Attorneys' Manual is now § 9–23.400, which provides that a government attorney must seek approval from an Assistant Attorney General before initiating prosecution against any individual who has provided immunized testimony. In seeking such approval, the attorney must indicate "how he/she will show affirmatively that no other 'non-evidentiary' use has been or will be made of the compelled testimony in connection with the proposed prosecution (for example, by having the prosecution handled by an attorney unfamiliar with the substance of the compelled testimony)." Although the Manual is only an "internal guideline" intended to guide the exercise of prosecutorial discretion within the Department of Justice, *see United States v. Catino,* 735 F.2d 718, 725 (2d Cir.1984) (discussing a Department of Justice *Petite* policy); *United States v. Ng,* 699 F.2d 63, 71 (2d Cir.1983) (same), the government is encouraged to consider this policy in the future.

*Application of Legal Standards to the Facts*

■ After considering the affidavits, testimony, and other evidence proffered by the government in connection with the *Kastigar* hearing, this Court finds that the government has met its "heavy burden" of showing that the evidence it intends to use against defendant Rogers was derived from legitimate sources, independent of Rogers' compelled testimony. The proof shows that the subject matter of that testimony was unknown to Special Agent Naum, who headed the FBI's investigation, and Assistant United States Attorney Knapp, who had initial responsibility for this case. Naum testified that he was not even aware that Rogers provided immunized testimony until Rogers made his *Kastigar* motion. Bruce was not originally involved in the investigation, and did not become involved until some time after Rogers became a target. Bruce has not communicated the substance of the immunized testimony to anyone involved in this

case. Furthermore, it appears that Bruce himself has not reviewed the testimony since late 1984 or early 1985. During the hearing, Bruce expressed difficulty remembering the details of the testimony, and this Court found his testimony to be credible.

This Court is convinced that the government has a legitimate source for its anticipated evidence against defendant Rogers. It is apparent from the record that, based upon previous investigations conducted by the Internal Revenue Service, Bruce knew of Rogers' relationship with Mauro prior to Rogers' 1982 grand jury testimony. (See Bruce Affid. ¶ 4).

Moreover, Rogers did not become a target of the investigation until late 1989 or early 1990, when his conversations with Mauro were intercepted during the second wiretap. At that point, Bruce still had no role in the investigation. The government has proven through the testimony of Special Agent Naum that it had prior information about Rogers' identity and activities through intercepted communications between Peter Spero and Fred Saia, and through the October 1989 report sent to the Buffalo FBI office from the Louisville FBI office. (Exh. I). Further information about Rogers' relationship with Mauro was obtained through the 1983 wiretap conducted by the New York State Police, and through a confidential FBI informant. (Exh. F, ¶¶ 21, 91–93). Other evidence can be traced to the February 1990 search warrant. It is significant that no mention of Rogers' immunized testimony is made in the wiretap or search warrant applications. As noted in footnote 4 above, the contents of these applications confirm the statements of Naum and Knapp that they were unaware that Rogers provided such testimony. (See Exh. F, ¶ 96). *See Gallo*, 671 F.Supp. at 124

(judgment of acquittal not required, despite the fact that government referred to defendant's immunized testimony in an application seeking an expansion of electronic eavesdropping activities).

In addition, this Court finds that Bruce did not disclose the contents of Rogers' immunized testimony in connection with the government's application for pen registers on phones used by Mauro. According to the testimony of Special Agent Naum, these pen registers show calls from Mauro to Ben Rogers in Las Vegas during a period of approximately October 1988 to December 1989.

With regard to the anticipated testimony of Peter Spero and Dana Iser, this Court finds that the government did not learn of these witnesses through Rogers' compelled testimony. The roles of these individuals became clear through the wiretaps. Furthermore, Bruce indicated that he had been aware of Peter Spero's association with Nicholas Mauro prior to obtaining Rogers' immunized testimony.

Therefore, this Court has determined that the government has met its "heavy burden" of showing that its anticipated evidence against defendant Rogers was obtained through legitimate sources, independent of Rogers' immunized testimony. Although defendant argues that Bruce's knowledge of the immunized testimony may result in an impermissible "use" of that testimony against him, defendant's general speculations regarding potential subtle effects of Bruce's knowledge are unavailing. They have no relation to the evidence that will be introduced against defendant, and they have not been confirmed by the proof introduced during the *Kastigar* hearing.[6]

6. During cross-examination of Bruce at the *Kastigar* hearing, counsel for defendant Rogers pursued a line of questioning concerning Bruce's state of knowledge regarding Rogers' residence in Kentucky or Nevada. Counsel inquired about pen registers showing calls from Mauro to a phone number in Las Vegas, Nevada, and about a January 7, 1992 plea hearing concerning Nicholas Mauro's son, Charles Mauro, during which Bruce stated that Nicholas Mauro's alleged gambling operation was receiving line information from Kentucky. During the *Kastigar* hearing Bruce testified that, rather than Kentucky, he

should have said Nevada. Bruce stated that he knew at the time of the plea hearing that Rogers had previously resided in Kentucky.

This Court has considered this testimony in connection with defendant Rogers' *Kastigar* motion. However, this Court has determined that none of this testimony undermines the government's proof that it had a legitimate, independent basis for all its anticipated evidence against defendant Rogers. Even if this Court were to assume that Bruce had some recollection of the information provided during Rogers' immunized testimony, such an assumption would result in

## CONCLUSION

For the reasons discussed above, this Court finds that the government has established legitimate sources for its anticipated evidence against defendant Rogers, independent of Rogers' immunized testimony. Therefore, Rogers' rights under the Fifth Amendment and 18 U.S.C. § 6002 have not been infringed. Furthermore, defendant has demonstrated no reason to disqualify Assistant United States Attorney Anthony M. Bruce from prosecuting this case, due to his exposure to Rogers' immunized testimony. Therefore, defendant Rogers' Motion in Limine will be denied in all respects. Nonetheless, defendant Rogers is invited to renew his motion at the end of trial, in the event that the evidence warrants a reconsideration of this decision.

no more than mere speculation about unspecified, subtle effects of Rogers' immunized testimony. As such, it would be insufficient to justify suppression of any of the government's anticipated evidence.